Maurice B. VerStandig, Esq.
Nevada Bar No.: 15346
**THE VERSTANDIG LAW FIRM, LLC**
1452 W. Horizon Ridge Pkwy, #665
Henderson, NV 89012
Telephone:  (301) 444-4600
Facsimile:  (301) 444-4600
Email: *mac@mbvesq.com*

Matthew E. Feinberg (*pro hac vice* forthcoming)
Todd Reinecker (*pro hac vice* forthcoming)
Mansitan Sow (*pro hac vice* forthcoming)
Matthew T. Healy (*pro hac vice* forthcoming)
**PILIEROMAZZA PLLC**
1001 G Street, NW, Suite 1100
Washington, D.C. 20001
Telephone: (202) 857-1000
Email: *mfeinberg@pilieromazza.com*
Email: *trienecker@pilieromazza.com*
Email: *msow@pilieromazza.com*
Email: *mhealy@pilieromazza.com*

*Attorneys for Plaintiff, VSolvt LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| VSOLVIT LLC, a Nevada limited liability company<br><br>Plaintiff,<br><br>v.<br><br>SOHUM SYSTEMS, LLC, a Kansas limited liability company<br><br>and<br><br>CREATIVE INFORMATION TECHNOLOGY, INC., a Maryland corporation,<br><br>Defendants. | Case Number 2:23-cv-454<br><br>*Plaintiff's, VSolvit LLC, Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Points and Authorities in Support Thereof*<br><br><br>**ORAL ARGUMENT REQUESTED** |

## MOTION

Plaintiff, VSolvit, LLC ("VSolvit" or "Plaintiff"), in the above-captioned action, by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 65, hereby moves this Honorable Court to enter a Temporary Restraining Order and Preliminary Injunction (the "Motion") against Defendants, Sohum Systems, LLC ("Sohum") and Creative Information Technology, Inc. ("CITI") (collectively, "Defendants"). The grounds for this Motion are set forth in VSolvit's Memorandum of Points and Authorities, below.

WHEREFORE, VSolvit respectfully requests that this Honorable Court grant its Motion and that the Court enter a temporary restraining order and preliminary injunction against Defendants in accordance with the requested relief herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

VSolvit, pursuant to Federal Rule of Civil Procedure 7 and Local Rule 7-2, submits this Memorandum of Points and Authorities in support of its Motion for a Temporary Restraining Order and Preliminary Injunction and respectfully requests that this Honorable Court grant the motion. In support thereof, Plaintiff states as follows:

## I.    INTRODUCTION

This case arises out of a dispute between federal government contractors who agreed to team together in pursuit of a lucrative upcoming federal contract with the United States Department of Agriculture ("USDA"). The parties entered into an exclusive agreement to work together to bid on and obtain the contract award, where Plaintiff would serve as the prime contractor and Defendants would serve as subcontractors. The parties' exclusive arrangement prohibited Defendants from pursuing the USDA contract themselves as a prime contractor or as part of another bidding team. In reliance on the parties' contractual promises, Plaintiff shared its

1    confidential and proprietary information with Defendants and made material progress in

2    furtherance of the parties' exclusive relationship.   However, after ten months of active

3    collaboration, planning, preparation, and extensive confidential information sharing, Defendants

4    announced their intention to breach the parties' contract, abandon VSolvit's team, and, instead,

5    team together on a separate bid, with Defendant Sohum to act as prime contractor and Defendant

6    CITI to act as Sohum's subcontractor.   VSolvit immediately called Defendants' attention to

7    Defendants' obligations under their exclusive contract, but Defendants refused to honor their

8    commitments.   Rather, after purporting to terminate the parties' agreement, Sohum represented to

9    VSolvit that VSolvit could remain a part of the bidding team, just in the materially different role

10   of subcontractor, with no control over the contract or its work.   Sohum and CITI had no genuine

11   intention of teaming with Plaintiff.   Rather than collaborate as agreed in the parties' contract,

12   Defendants unilaterally advanced their own interests and downloaded copies of Plaintiff's

13   confidential information and proprietary win strategy for the USDA contract to use in their own

14   competing bid.   But the harm here runs even deeper than that.   Given the imminent release of the

15   USDA bidding opportunity, it is too late for VSolvit to simply pick-up the pieces and create a new

16   team.   And Defendants' use of VSolvit's proprietary information puts VSolvit at a tremendous

17   competitive disadvantage, essentially guaranteeing that VSolvit will be unable to submit a

18   competitive bid for the USDA contract.

19        This motion for a temporary restraining order and preliminary injunction is necessary to

20   ensure Defendants do not get away with their callous disregard and patent breach of the parties'

21   exclusive agreement and their theft of proprietary information.   The Court must step in on an

22   emergency basis and enjoin Defendants from competing against VSolvit for the USDA contract.

1    In addition, the Court must compel Defendants to rejoin VSolvit's team.  These orders are the only

2    way VSolvit will avoid the irreparable harm that it will suffer if Defendants are not enjoined.

3    **II.    FACTS**

4    **A.    Basic Principles of Federal Government Contracting**

5    When a government agency has a requirement to be fulfilled by contractors, it may issue a

6    Request for Proposals ("RFP") or Solicitation for bids ("Solicitation").  Compl. ¶ 13.  The type of

7    economic activity that will be performed under the contract is classified under the North American

8    Industry Classification System ("NAICS").  *Id.*  NAICS uses a six-digit hierarchical coding system

9    to classify all economic activity into twenty industry sectors.  *Id.*

10    Contractors that operate under the corresponding NAICS code(s) assigned to the RFP may

11    submit an offer/proposal/bid for award of a federal government contract.  *Id.* ¶ 14.  Contractors

12    that operate under the same NAICS codes are competitors because they are eligible to bid and

13    actually bid on federal contracts available under those NAICS codes.  *Id.* ¶ 15.

14    Upon submissions of proposals (sometimes referred to as offers or bids) by proposed

15    contractors, the government agency issuing the federal contract reviews the offers and issues a

16    contract award to the successful offeror or bidder.  *Id.* ¶ 16.  Depending on the RFP and contract

17    in question, the Government can award a stand-alone contract; a contract vehicle under which

18    awardees will compete for and/or receive task orders; or task orders under those vehicles.  *Id.* ¶

19    17.

20    **B.    Teaming Arrangements**

21    Under the Federal Acquisition Regulations, FAR 9.602(a), contractors can combine their

22    capabilities to bid on federal procurement opportunities by executing a teaming arrangement in

23    order to submit a well-rounded proposal that they believe presents better value than submitting a

1    proposal on their own.  *Id.* ¶ 18.  Teaming arrangements permit contractors to better respond to

2    Solicitations while offering the federal government the benefits of an improved team bid.  *Id.* ¶ 19.

3    In accordance with FAR 9.601, one of the forms a teaming arrangement can take is for one of the

4    members of the teaming arrangement can act as the prime contractor with the other companies

5    acting as the prime contractor's subcontractors.  *Id.* ¶ 21.  The latter type of these arrangements

6    are commonly referred to as "teaming agreements."  *Id.*

7        **C.        Background on the Parties**

8        VSolvit, Sohum, and CITI are all federal contractors that work in the Information

9    Technology ("IT") industry.  *Id.* ¶¶ 22, 25, 28.  Each company provides services such as cyber

10   security management, cloud computing, engineering services, and program and project

11   management.  *Id.* ¶¶ 22, 25, 28.  All three companies compete for federal contracts under some of

12   the same NAICS codes, making them competitors when they are not teaming together.  *Id.* ¶¶ 15,

13   24, 27, 30.

14       **D.        CIO-SP3 Small Business Contract Vehicle**

15       "Chief Information Officer-Solutions and Partners 3 Small Business" ("CIO-SP3 SB") is

16   an Indefinite Delivery/Indefinite Quantity ("IDIQ"), unrestricted multiple award contract

17   ("MAC"), small business contract vehicle held by 307 businesses, including VSolvit and Sohum.

18   *Id.* ¶ 31.  VSolvit was awarded CIO-SP3 on May 11, 2020, and Sohum received it via Government-

19   approved novation (*i.e.*, acquisition or transfer from another contractor) on December 5, 2022.  *Id.*

20   ¶ 32.  Under CIO-SP3, the Government issues RFPs for task orders.  *Id.* ¶ 33.

21       **E.        USDA FPAC Farm Programs Software Delivery (Beech)**

22       USDA FPAC Farm Programs Software Delivery ("Beech") is a task order that is expected

23   to be imminently issued by the United States Department of Agriculture ("USDA"), most likely

1    under the CIO-SP3 SB contract vehicle. *Id.* ¶ 34. By issuing Beech under CIO-SP3 SB, the USDA

2    is limiting competition to contractors who hold a CIO-SP3 SB prime contract. *Id.* ¶ 35. Beech is

3    expected to be a consolidation of several existing task orders, including two task orders currently

4    being performed by VSolvit and the Defendants under a subcontracting relationship: (1) USDA

5    FSA Application Development Common Farm Program Systems; and (2) USDA FSA Application

6    Development Subsidy and Disaster Systems (hereinafter collectively referred to as the "Task

7    Orders" for the "PARMO" contract). *Id.* ¶ 36. Beech is a long-term contract; bidding opportunities

8    do not arise often for such lucrative, long-term contracts, particularly for small businesses. *Id.*

9        **F.    PARMO Contract**

10        On or about May 23, 2012, the Department of Health and Human Services awarded the

11    CIO-SP3 unrestricted vehicle (as opposed to the small business, or SB, vehicle) to CITI. *Id.* ¶ 37.

12    On or about August 15, 2017, the USDA issued to CITI the Application Development Subsidy and

13    Disaster Systems Task Order under the CIO-SP3 unrestricted vehicle. *Id.* ¶ 38. On or about

14    September 11, 2017, the USDA issued, to CITI, the Application Development Common Farm

15    Program Systems Task Order under the CIO-SP3 unrestricted vehicle. *Id.* ¶ 39. On October 12,

16    2017 and October 16, 2017, VSolvit and the Defendants entered into agreements ("PARMO

17    Agreements") to split the workshare of the Task Orders, with each party being guaranteed at least

18    25% of the work performed under the PARMO contract. *Id.* ¶ 40. Per the PARMO Agreements,

19    VSolvit and the Defendants were to share revenue and profits equally. *Id.* ¶ 41. Each of the Parties

20    was to receive a 25% workshare, with the remaining 25% to either be allocated to a third party or

21    split evenly among the parties. *Id.* The parties were to true up the revenue share at the end of each

22    quarter in order to ensure each of them met their desired goal. *Id.* Over the term of the PARMO

23    Agreements, CITI (as PARMO prime contractor) and Sohum failed to allocate equal workshare

and revenue to VSolvit.  *Id.* ¶ 42.  In the quarter ended December 31, 2022, for instance, VSolvit received only 13.46% of the workshare on the PARMO contract, while CITI and Sohum have unduly benefited from 36.77% and 49.77% workshare, respectively.  *Id.*

**G.    Teaming Agreements for Beech RFP**

Given the importance of the Beech contract to the Parties' business, in Spring 2022, approximately a year before the Beech RFP would be issued, the Parties began to prepare for the upcoming bid.  *Id.* ¶ 43.  The parties decided to team together because they each possess unique capabilities, experience, and past performance with USDA, including all serving as incumbent contract performers for USDA on the PARMO contract.  *Id.* ¶ 44.  On June 13, 2022, VSolvit and Defendants entered into and executed Teaming Agreement T724-20889 (hereinafter, the "Agreement" or the "Teaming Agreement") for the pursuit of Beech.  *Id.* ¶ 45.  A true and correct copy of the Teaming Agreement, redacted of proprietary and confidential information, is attached hereto as Exhibit A.  *Id.* ¶ 45.

Under Article 1.1 of the Teaming Agreement, VSolvit has the sole and exclusive discretion to serve as or designate the prime contractor ("Prime") for the pursuit of Beech.  *Id.* ¶ 46; Exhibit A § 1.1.  Indeed, VSolvit could choose to designate itself or a teaming partner or joint venture in which it was an owner as the prime contractor, depending on the procurement vehicle under which the Beech RFP would be issued.  Compl. ¶ 47; Exhibit A § 1.1.  The position of Prime is of critical importance to VSolvit because it permits VSolvit to maintain control over its workshare, which, as described above, it was not able to do when CITI was Prime for the PARMO contract.  Compl. ¶ 48.  The Agreement also requires Defendants to commit to an exclusive relationship with each other to support VSolvit, the designated Prime, in the pursuit of Beech.  *Id.* ¶ 49; Exhibit A § 1.3. Specifically, under Article 1.3 of the Agreement, Defendants agreed to

1                        commit to an exclusive agreement for Subcontractors to support
2                        Prime Contractor.  Subcontractors shall not act as a Prime offeror,
3                        have not entered into any teaming arrangements with other offerors
4                        under the Program prior to this Agreement, nor will they enter into
5                        any teaming arrangements with other offerors under the program
6                        after this Agreement, and that they shall otherwise be teamed
7                        exclusively with Prime Contractor with regards to the Program. [ ]
8                        Subcontractors agree that this restriction is reasonable and agreed to
9                        by Subcontractors in consideration for Prime Contractor's execution
10                        of this Agreement.

Compl. ¶ 50; Exhibit A § 1.3.  Exclusivity was the primary and material purpose of the Agreement.

Compl. ¶ 51.  The fact that the parties had agreed to team exclusively gave VSolvit the trust and

peace of mind necessary for VSolvit to share its win themes and strategies and its confidential and

proprietary information in pursuit of the best possible proposal for the Beech contract.  *Id.*  VSolvit

expected Defendants to abide by the exclusivity provisions in the Agreement.  *Id.* ¶ 52.  The

exclusivity provision was material to VSolvit, and VSolvit would not have entered into the

Agreement without Defendants' promises of exclusivity.  *Id.* ¶ 53.

       As early as April 2022, VSolvit and Defendants began discussing win themes for their

pursuit of the Beech contract.  *Id.* ¶ 54.  On May 2, 2022, VSolvit informed Defendants that it was

designating itself as prime contractor on Beech, as it was permitted to do under the Teaming

Agreement.  *Id.* ¶ 55; Exhibit A § 1.1.  Subsequent documentation and correspondence reinforced

this designation.  Compl. ¶ 55.

       On May 6, 2022, Plaintiff and Science Application International Corporation (hereinafter,

"SAIC"), executed Teaming Agreement T712-20889 for the pursuit of Beech, with SAIC to act as

a separate subcontractor to VSolvit.  *Id.* ¶ 56.  This separate teaming arrangement between VSolvit

and SAIC was specifically permitted by Section 1.3 of the Agreement.  *Id.* ¶ 57; Exhibit A § 1.3

("Prime Contractor shall have the right to contract with other entities to supplement Prime

Contractor's team for this Solicitation.").   The agreement with SAIC contained the same

1    exclusivity provision that was included in the Agreement.  Compl. ¶ 58.

2    VSolvit, Defendants, and SAIC began pre-proposal activities in September 2022.  *Id.* ¶ 59.

3    Over the course of the parties' work toward obtaining the Beech contract, VSolvit conducted many

4    team planning meetings designed to move the team's proposal forward in a cohesive and

5    collaborative way.  *Id.* ¶ 60.  From September 2022 through January 2023, the Parties exchanged

6    confidential and proprietary information related to the upcoming bid, including VSolvit's proposed

7    technical approach to the Beech work.  *Id.* ¶ 61.  VSolvit provided Defendants its confidential and

8    proprietary information in order to coordinate and enhance the parties' efforts on the Beech bid.

9    *Id.* ¶ 62.  During that time, the Parties and SAIC worked in collaboration to develop win themes

10    (*i.e.*, strategies for success in the bidding process) for the Beech proposal submission.  *Id.* ¶ 63.

11    The win theme documents discuss current known challenges on all programs and developed

12    concepts for mitigation strategies to be employed.  *Id.* ¶ 64.  They contain VSolvit's internal

13    process of developing win theme statements as well as complete win theme statements and

14    differentiators.  *Id.*  Essentially, these documents set forth VSolvit's detailed win strategy for the

15    Beech procurement.  *Id.*  Therefore, a competitor's use of this information would give the

16    competitor an undue and unfair competitive advantage in the bidding process and allow the

17    competitor to develop similar win themes or develop points of emphasis against VSolvit's solution

18    to discredit it.  *Id.*

19    These win themes, and VSolvit's confidential and proprietary information, were shared

20    with Sohum and CITI only because the Parties had agreed to an exclusive teaming arrangement

21    where they would combine their capabilities to create the best possible chance that the team, with

22    VSolvit as prime contractor, would win the Beech award.  *Id.* ¶ 65.  Meanwhile, unbeknownst to

23    VSolvit, Sohum and CITI were negotiating behind the scenes to improperly exit the teaming

1    arrangement, wrest control of the upcoming bid, minimize VSolvit's participation (just like they

2    had done with regard to the PARMO contract workshare), and utilize VSolvit's confidential and

3    proprietary information for their own substantial benefit.  *Id.* ¶ 66.

4    **H.    Defendants' Improper Termination for Convenience & Anticipatory Breach**
5    **of the Agreement**
6
7        Sohum's and CITI's scheme came to fruition when, on February 9, 2023, Sohum sent an

8    email to VSolvit stating its desire to terminate the Teaming Agreement for convenience pursuant

9    to Article 10.4 and pursue Beech as a prime contract offeror.  *Id.* ¶ 67.  Sohum also stated that it

10   wished to engage SAIC as a subcontractor.  *Id.*  Sohum's and CITI's collusion was made obvious

11   by the fact that, on the same day, February 9, 2023, CITI also sent an email to VSolvit stating that

12   it was terminating the Teaming Agreement for convenience pursuant to Article 10.4 and would be

13   moving forward to bid on the Beech contract as part of a team with Sohum as Prime.  *Id.* ¶ 68.

14   CITI also expressed its desire to use all of the information it has collected thus far from VSolvit in

15   its new team with Sohum.  *Id.*

16       A termination for convenience does not absolve Defendants from their obligation to team

17   exclusively with VSolvit as the Prime.  *Id.* ¶ 69.  Section 1.3 of the Teaming Agreement

18   specifically states that the Parties will not "enter into any teaming arrangements with other offerors

19   under the [Beech] Program after this Agreement, and that they shall otherwise be teamed

20   exclusively with Prime Contractor with regards to the Program[]," which is a specific reference to

21   exclusivity obligation continuing even after a termination and for all purposes relating to the Beech

22   RFP.  *Id.* ¶ 71.

23       On February 11, 2023, VSolvit informed Sohum and CITI that VSolvit did not agree to a

24   change in Prime.  *Id.* ¶ 73.  VSolvit also reminded Sohum that discussions with SAIC were

25   unacceptable given VSolvit's exclusive relationship with SAIC.  *Id.*  Despite this warning, SAIC

1    later informed VSolvit that CITI reached out to SAIC directly to discuss Beech.  *Id.* ¶ 74.  On

2    February 21, 2023, VSolvit sent letters to Defendants demanding that the Defendants cure their

3    breach of the Agreement by February 23, 2023.  *Id.* ¶ 75.  Defendants refused.  *Id.*  nevertheless,

4    VSolvit continued to try to repair the relationship and compel Defendants to perform the Teaming

5    Agreement, to no avail.  *Id.* ¶ 76.

6    **I.    Defendants' Access of VSolvit's Beech Team Drive**

7         After Defendants terminated the Agreement, and while VSolvit was attempting to resolve

8    Defendants' anticipatory breaches of the Teaming Agreement, Defendants continued to access,

9    review and copy confidential and proprietary documents in the VSolvit Beech team drive,

10   including VSolvit's confidential and proprietary information and technical approach to the Beech

11   program.  *Id.* ¶ 78.  Specifically, the day after Sohum notified VSolvit of its termination for

12   convenience of the Agreement, on February 10, 2023, Sohum viewed and copied a technical

13   outline the parties had compiled for their team use on the Beech proposal.  *Id.* ¶ 79.  This document

14   outlines VSolvit's strategy for developing its technical response to the upcoming RFP.  *Id.* ¶ 80.

15   It also shows VSolvit's technical approach and how VSolvit would present that information to the

16   Government, which could then be exploited as a building block to improve upon Defendants'

17   competitive proposal.  *Id.*

18        On February 14, 2023, Sohum viewed and copied a number of other technical documents,

19   including other technical outlines, experience narratives, staffing plans, company profiles, key

20   personnel resumes, and other confidential and proprietary information that had been created for

21   use on VSolvit's bid for the Beech contract.  *Id.* ¶ 81.  On February 15, 2023, Sohum viewed and

22   copied documents related to the Parties' prior experience on similar projects and resumes of key

23   personnel.  *Id.* ¶ 82.  On March 2, 2023, Sohum viewed VSolvit's technical outline.  *Id.* ¶ 83.  The

1  document includes highly confidential and proprietary details leading into VSolvit's proposed

2  solution for the Beech RFP. *Id.* Sohum viewed the USDA Beech Technical 1 Outline twice: first

3  during a live collaborative technical outline discussion in which Sohum was able to see all of the

4  updates made to the document as they occurred; and the second time after the discussion had

5  concluded. *Id.* ¶ 84.

6       All the information viewed and downloaded was confidential and proprietary and, if

7  obtained by a competitor, would give that competitor an unfair advantage in the bidding for the

8  Beech contract through detailed knowledge of VSolvit's approach to winning the contract. *Id.* ¶

9  86. The technical information in particular is damaging in the wrong hands. *Id.* ¶ 85. Often the

10  most critical factor in the Government's evaluation of proposals is a contractor's technical

11  approach and capability. *Id.* The only reason Defendants would access, review, and download

12  VSolvit's confidential information after their terminations for convenience is to use the

13  information to compete against VSolvit for Beech. *Id.* ¶ 87. VSolvit invested many hours and

14  company resources in proposal preparation efforts for the benefit of all team members, and

15  exchanged confidential and proprietary information with Defendants, in reliance on the Parties'

16  mutual promises, as set forth in the Agreement, specifically their agreement to combine their

17  capabilities and team exclusively to respond to the Beech RFP. *Id.* ¶ 88.

18       VSolvit's attempts to encourage Defendants to cure their anticipatory breach were

19  unsuccessful. *Id.* ¶ 90. Now, VSolvit it faced with the upcoming Beech RFP without a team. *Id.*

20  The Beech RFP is expected to be released within weeks, and VSolvit does not have sufficient time

21  to create a new proposal approach or locate and team with other capable contractors on the Beech

22  effort. *Id.* ¶ 91. Proposals are expected to be due approximately 30 days following release of the

23  RFP. *Id.* Given the imminent release date for the Beech RFP, all or virtually all quality teammates

1   are already part of other teams and deep in the process of preparing proposals.  *Id.* ¶ 92.  Most, if

2   not all, competitive teams have been preparing for proposal submission for months.  *Id.*

3       Even if VSolvit was able to identify teaming partners, VSolvit would not have the time to

4   prepare a competitive proposal or develop relationships where the parties would be comfortable

5   exchanging the kind of confidential and proprietary information necessary for a successful bid.  *Id.*

6   ¶ 93.  It takes months of persistent work and team collaboration to prepare a successful bid for a

7   contract like Beech.  *Id.*  Absent Defendants complying with their obligations under the Teaming

8   Agreement, VSolvit would be forced to start over from scratch to compete for Beech.  *Id.*  With

9   the odds stacked heavily against it, VSolvit may not be able to submit a bid for Beech at all.  *Id.* ¶

10  94.  If it can submit a bid, VSolvit will have virtually no chance to meaningfully compete for award

11  and will be assured of certain defeat in the bidding process.  *Id.* ¶ 95.

12      In order to salvage its efforts to procure the Beech contract, to protect its confidential and

13  proprietary information, and to avoid certain irreparable harm, VSolvit now seeks a temporary

14  restraining order and preliminary injunction to compel Defendants to comply with the Teaming

15  Agreement.

16  **III.    STANDARD**

17      When moving the Court for the temporary restraining order and/or preliminary injunction,

18  a party must "'establish that he is likely to succeed on the merits, that he is likely to suffer

19  irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

20  and that an injunction is in the public interest.'"  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

21  1188 (9th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "All

22  four elements must be satisfied."  *Id.* (citing *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d

23  1046, 1057 (9th Cir. 2009)).  Courts in the Ninth Circuit use a "'sliding scale' approach to these

1  factors, according to which 'a stronger showing of one element may offset a weaker showing of

2  another.'" *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

3  Thus, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need

4  demonstrate only 'serious questions going to the merits.'" *Id.* (quoting *All. for the Wild Rockies*,

5  632 F.3d at 1135).

6  **IV.   ARGUMENT**

7       In this case, all of the preliminary injunction factors weigh heavily in favor of the Court

8  granting injunctive relief.  For the reasons stated herein, this Court should enter a temporary

9  restraining order and preliminary injunction (a) enjoining Defendants from bidding on the Beech

10  RFP as a prime contractor (whether independently or as part of a team) or as a subcontractor on

11  any team other than the VSolvit team as expressly contemplated by the Agreement; (b) enjoining

12  Defendants from entering into any teaming arrangements with other offerors under the Beech

13  program now or at any time hereafter; and (c) compelling Defendants to team with VSolvit on an

14  exclusive basis for the award of the Beech contract, including the submission of a proposal in good

15  faith.

16       **A.   VSolvit is Likely to Succeed on the Merits of Its Claims**

17       VSolvit has a strong likelihood of success on the merits of its Anticipatory Breach of

18  Contract claim.  "An anticipatory breach is a breach of a contract that occurs when one party to

19  the contract, without justification and prior to a breach by the other party, makes a statement or

20  engages in conduct indicating that it will not or cannot substantially perform its duties under the

21  contract." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1250 (D. Nev. 2016), *amended in*

22  *part on other grounds*, No. 3:13-cv-0445-LRH-VPC, 2016 WL 11722898 (D. Nev. Nov. 1, 2016)

23  (citing *Nev. Power Co. v. Calpine Corp.*, No CV-S-04-1526-PMP (PAL), 2006 WL 1582101, at

1   *10 (D. Nev. June 1, 2006)).  "An anticipatory breach, or repudiation, of a contract may be express

2   or implied."  *Id.*  "An express repudiation occurs when one party demonstrates 'a definite

3   unequivocal and absolute intent not to perform a substantial portion of the contract.'"  *Id.* (quoting

4   *Kahle v. Kostiner*, 455 P.2d 42, 44 (1969)); *see also Stratosphere Litig. L.L.C. v. Grand Casinos*,

5   *Inc.*, 298 F.3d 1137, 1147 (9th Cir. 2002) ("[a]nticipatory repudiation occurs when a party through

6   conduct or language makes a clear, positive and unequivocal declaration of an intent not to

7   perform.").  Here, there is no reasonable question that Sohum and CITI anticipatorily breached the

8   exclusivity provision in the Teaming Agreement, and they should be enjoined from committing

9   such breach.

10      As noted above, on June 13, 2022, VSolvit, Sohum, and CITI executed the Teaming

11  Agreement for purposes of pursuing the Beech contract.  Compl. ¶ 45; Exhibit A.  The parties

12  entered into the Teaming Agreement because VSolvit, Sohum, and CITI each possess unique

13  capabilities, experience, and past performance with USDA, Compl. ¶ 44, and they "determined,

14  [that] by teaming their complementary talents and capabilities[,] they will offer [the Government]

15  a superior combination of management, technical performance, cost, and delivery schedule to meet

16  the [Government's] requirements[,]" Exhibit A at 1.  The parties further acknowledged and agreed

17  that Sohum and CITI "wish to support [VSolvit's] pursuit of the Program as team members and,

18  if [Vsolvit] is awarded a prime contract . . . to execute and perform subcontracts . . . with [Vsolvit]

19  for the work described in the [Beech contract]."  *Id.*

20      In furtherance of those central purposes and promises, the parties, with Sohum and CITI as

21  "Subcontractors," and VSolvit as "Prime Contractor," agreed to be an exclusive team.  *Id.* § 1.3.

22  Article 1.3 of the Teaming Agreement set forth as follows:

23              Under this Agreement, Subcontractors and Prime Contractor
24              commit to an exclusive agreement for Subcontractors to support

> Prime Contractor. Subcontractors shall not act as a Prime offeror, have not entered into any teaming arrangements with other offerors under the Program prior to this Agreement, nor will they enter into any teaming arrangements with other offerors under the Program after this Agreement, and that they shall otherwise be teamed exclusively with Prime Contractor with regards to the Program. [ ] Subcontractors agree that this restriction is reasonable and agreed to by Subcontractors in consideration for Prime Contractor's execution of this Agreement.

*Id.* Accordingly, Sohum and CITI agreed that they would support VSolvit's bid for the Beech contract and that they would do so exclusively. The parties' declarations of intent, along with their unequivocal agreement to compete exclusively with each other as a team for the Beech contract, formed the primary and material purposes of the Teaming Agreement. *See id.*; Compl. ¶¶ 51-53, 88. Defendants' agreement to exclusively team with VSolvit gave VSolvit the trust and peace of mind necessary for VSolvit to share its win strategy and confidential and proprietary information with Defendants in pursuit of the best possible proposal for the Beech contract. Compl. ¶ 51. VSolvit expected Sohum and CITI to abide by the exclusivity provision of the Teaming Agreement, and VSolvit would not have entered into the Teaming Agreement without Sohum's and CITI's promises of exclusivity. *Id.* ¶¶ 52. For months, the parties performed as contemplated in the Teaming Agreement. *Id.* ¶¶ 54-65. With justifiable reliance on the promises and obligations in the Teaming Agreement, and with reasonable expectation of Defendants' continued exclusive performance, VSolvit shared its confidential and proprietary information with Sohum and CITI in furtherance of their exclusive relationship. *Id.* ¶¶ 54, 59-65.

Despite their exclusivity obligations to VSolvit, however, on February 9, 2023, after months of preparation for the upcoming Beech bid, both Sohum and CITI notified VSolvit that they intended to terminate the Teaming Agreement for their convenience; and instead, they would form their own, separate team and bid together for the Beech contract, with Sohum as the prime

contractor and CITI as a subcontractor.  *Id.* ¶¶ 67-68.  Sohum's and CITI's declared intentions are a direct repudiation of their obligations under the Teaming Agreement.  Indeed, the Teaming Agreement expressly prohibits Sohum and CITI from "act[ing] as a Prime offeror" on the Beech RFP and from "enter[ing] into any teaming arrangements with other offerors under the [Beech] Program after this Agreement."  Exhibit A § 1.3.  Put simply, the Teaming Agreement requires Sohum to CITI to "be teamed exclusively" with VSolvit, *id.*, but just weeks before the Beech RFP is to be released, Sohum and CITI declared that they would no longer honor their exclusivity obligations under the Teaming Agreement, Compl. ¶¶ 67-68.  By making such express declarations, Sohum and CITI anticipatorily breached the Teaming Agreement under Nevada law. *Shaw*, 201 F. Supp. 3d at 1250.

### 1.      The Exclusivity Clause is Binding and Enforceable

The parties' exclusivity obligations in the Teaming Agreement are binding and enforceable.  Indeed, federal courts regularly enforce exclusivity clauses between teaming partners in pursuit of federal contracts.  *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659 (3d Cir. 1998), is instructive.

In *ATACS*, a proposed prime contractor and proposed subcontractor entered into a teaming agreement to bid on a request for proposals ("RFP") for a contract to manufacture communications shelters for the government of Greece.  *Id.* at 662.  The teaming agreement included a provision designating the parties' relationship that stated, in pertinent part, that "Transworld will be the Prime Contractor" and "ATACS will be a sub-contractor to Transworld . . . ."  *Id.*  The teaming agreement also established that "ATACS agrees to work exclusively with Transworld on this project.  Transworld agrees to work exclusively with ATACS relative to the ATACS Scope of Work . . . ."  *Id.*  at 663.  While proposals were being considered by the Greek government, the

1    proposed prime contractor reached out to one of the proposed subcontractor's competitors to

2    discuss working together on the eventual contract to be awarded.  *Id.*  After award, the prime issued

3    a subcontract to the competitor, and the original intended subcontractor sued.  *Id.* at 664.

4         In the trial court, the prime contractor challenged the validity and enforceability of the

5    teaming agreement and its exclusivity provisions.  *Id.*  The trial court concluded that the teaming

6    agreement "constituted an enforceable contract with sufficiently definite terms for enforcement"

7    and that it represented an "outward manifestation of the parties' intent . . . that the terms of the

8    legally binding agreement . . . entailed a promise by defendant to work exclusively with plaintiffs

9    in its bid for the Greek RFP . . . ."  *Id.*

10        On appeal, the Third Circuit explained: "a teaming agreement is an arrangement whereby

11   a subcontractor will 'team' with a company intending to bid on a government contract as a prime

12   contractor in order to pool financial and technical resources."  *Id.* at 666 (citing *Northrop Corp. v.*

13   *McDonnell Douglas Corp.*, 705 F.2d 1030, 1037 n.1 (9th Cir. 1983)).  "Parties to such a teaming

14   agreement benefit from the arrangement not only as a means of sharing resources, but also as a

15   hedge against the many uncertainties involved in government contracting."  *Id.*  Where a party is

16   accused of breaching a teaming agreement, the Court considers "the intent of the parties to enter

17   into a binding contractual relationship" and "the existence of sufficiently objective criteria to

18   enforce."  *Id.* (citing *Allen & Co. v. Occidental Petroleum Corp.*, 382 F. Supp. 1052, 1057

19   (S.D.N.Y. 1974), *aff'd*, 519 F.2d 788 (2d Cir. 1975)).  The Third Circuit explained: "if the parties

20   intended the teaming agreement itself to constitute a binding agreement that enumerated definite

21   terms of behavior governing the parties during, or even after, the bidding process[,]" a teaming

22   agreement will be considered valid and enforceable.  *Id.* at 667 (citations omitted).  "Such terms

23   might include the subcontractor's assistance in the prime contractor's proposal in return for the

prime contractor's delivery of an agreeable subcontract. . . .  **Or, the parties might promise to work exclusively with each other in preparing the bid for the government contract**." *Id.* (emphasis added) (citing *Northrop Corp.*, 705 F.2d at 1038; *see also Advance Telecom Process LLC v. DSFederal, Inc.*, 119 A.3d 175, 179 (Md. Ct. Spec. App. 2015) ("where a teaming agreement provides for obligations that are definite and mutually agreed upon, such as an agreement to . . . negotiate exclusively, the obligations can be enforced."). In affirming the trial court, the Third Circuit found that the record "clearly indicat[ed]" the parties' "'inten[t] to team' and work exclusively with each other in preparation for the Greek RFP." *ATACS*, 155 F.3d at 668. Thus, the teaming agreement was enforceable as to the prime contractor's obligation to team exclusively with the subcontractor. *Id.*

The same result is required here. VSolvit, Sohum, and CITI used similar language in promising to team exclusively as the parties did in *ACATS*. Sohum and CITI specifically agreed that they would "commit to an exclusive agreement . . . to support [VSolvit]" and that they "shall not act as a Prime offeror" for the Beech program. Exhibit A § 1.3. They also agreed that they would "be teamed exclusively with [VSolvit] with regards to the [Beech] Program." *Id.*; *see also* ERIN L. TOOMEY, ET AL., GOVERNMENT CONTRACTS: TEAMING AGREEMENTS AND OTHER TEAMING ARRANGEMENTS, Westlaw 4-547-6585 (2023 Thomson Reuters) ("Parties to a teaming agreement often include exclusivity provisions barring the pursuit of the same Solicitation or contract award" outside the bargained-for relationship.). Under Nevada law, the language the parties use in their contract is the best indicator of their intent. *See Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1116 (D. Nev. 2014) ("'Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.'") (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d

1206, 1210 (9th Cir. 1999)).  And, the language the parties used in their contract here indicated they intended to team exclusively, with VSolvit as the prime contractor and Sohum and CITI as subcontractors.  Exhibit A §§ 1.1, 1.3.  Under *ATACS*, the exclusivity provision is enforceable, and Sohum and CITI should be enjoined from breaching it.

### 2.    The Exclusivity Clause Survives Sohum's and CITI's Terminations

When Sohum and CITI informed VSolvit that they would not honor their obligations under the exclusivity clause of the Teaming Agreement, they accompanied their declarations with notices of termination for convenience.  However, a termination for convenience has no effect on, and did not terminate, the parties' exclusivity obligations, because that provision, by its plain terms, survives termination.

"Nevada's longstanding policy is to interpret and enforce contracts based on the written language, reading words in their usual and ordinary meaning."  *Kmi Zeolite, Inc. v. U.S. Dep't of the Interior*, 2:15-cv-2038-JCM-NJK, 2019 WL 2616181, at *2 (D. Nev. June 26, 2019); *see also State ex rel. Masto v. Second Jud. Dist. Ct. ex rel. Cnty. of Washoe*, 199 P.3d 828, 832 (Nev. 2009) (Under Nevada law, "[i]n interpreting a contract, [courts] construe a contract that is clear on its face from the written language, and it should be enforced as written.") (citing *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 602 (2005)).  "Every word must be given effect if at all possible."  *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966); *see also Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978) (Nevada courts construe contracts such that all terms have meaning, and no terms are negated).  "[T]he court is not at liberty, either to disregard words used by the parties, descriptive of the subject matter or of any material incident, or to insert words which the parties have not made use of."  *Royal Indem.*, 413 P.2d at 502 (cleaned up) (quoting *Reno Club v. Young Inv. Co.*, 182 P.2d 1011, 1017 (1947)); *see also Int'l Bhd. of*

1   *Teamsters v. NASA Servs., Inc.,* 957 F.3d 1038, 1049-50 (9th Cir. 2020) ("When a contract is

2   reduced to writing, the intention of the parties is to be ascertained from the writing alone, if

3   possible" and "interpreted as to give effect to the mutual intention of the parties . . . .").

4          The exclusivity clause here reads, in pertinent part, that Sohum and CITI "shall not act as

5   a Prime offeror," they "have not entered into any teaming arrangements with other offerors under

6   the Program prior to this Agreement, nor will they enter into any teaming arrangements with other

7   offerors under the Program ***after this Agreement, and that they shall otherwise be teamed***

8   ***exclusively with Prime Contractor with regards to the Program.***"  Exhibit A § 1.3 (emphasis

9   added).  This language must be given full effect.  *Royal Indem.*, 413 P.2d at 502 ("Every word

10  must be given effect if at all possible.").  The plain, usual, and ordinary meaning of the terms the

11  parties chose for their agreement illustrates that the exclusivity clause was intended to survive even

12  *after* the termination or end of the Agreement, *i.e.*, "subsequent to," "later in time than," or "at the

13  close of," the Teaming Agreement.  *See After the Fact*, BLACK'S LAW DICTIONARY (11th ed. 2019)

14  ("[s]ubsequent   to   an   event   of   legal   significance");   *After*,   DICTIONARY.COM,

15  https://www.dictionary.com/browse/after ("later in time than; in succession to; at the close of").

16  Contractual context supports this interpretation.  The parties referenced the exclusivity clause in

17  terms of past ("prior to this Agreement"), present ("shall not act as a prime offeror"), and future

18  ("after this Agreement, and that they shall otherwise be teamed exclusively with Prime Contractor

19  with regards to the Program") obligations.  Exhibit A § 1.3.  The phrase "after this Agreement,"

20  coupled with the language "and that they shall otherwise be teamed exclusively with Prime

21  Contractor with regards to the Program" is an unequivocally clear statement that Defendants

22  promised exclusivity to Plaintiff for *all purposes* relating to the "Program," *i.e.*, the USDA Beech

23  RFP that is expected to be released imminently.  Indeed, elsewhere in the exclusivity clause, the

1    parties required each other to remain exclusive for "renewals, options or natural follow-on

2    business," which, by definition, could not arise until after VSolvit's anticipated prime contract was

3    over. *Id.* For these reasons, the exclusivity provision must be interpreted to survive termination.

4            In recent communications between the parties, Sohum and CITI now claim that the

5    exclusivity clause does not survive termination because it was not included in the "Survivability"

6    clause of the Teaming Agreement. Exhibit A § 15.10. The Survivability clause states that

7    "Articles 4, 6, 7, 12, 13, and 14, as well as the NDA obligations, unless otherwise superseded by

8    a subsequent grant between the Parties, shall survive the termination of this Agreement." *Id.*

9    Defendants' recently adopted position is without merit.

10           First, as argued above, the exclusivity clause contains its own survival language, *i.e.*, "after

11   this Agreement." *Id.* § 1.3. Given that the parties already determined and expressly agreed that

12   the exclusivity clause survived the termination of the Agreement, the parties had no reason to

13   include a redundant reference to Article 1.3 in the Survivability clause. *See Int'l Longshore &*

14   *Warehouse Union v. NLRB*, 978 F.3d 625, 642 (9th Cir. 2020) ("[T]he parties would have had no

15   reason to add a term . . . [to one part of a contract] if [another] section has already done so."). In

16   other words, the survivability language in Article 1.3 stands on its own.

17           Second, adopting Sohum's and CITI's interpretation of the Teaming Agreement would

18   require the Court to read non-existent terms into the parties' agreement and ignore terms upon

19   which the parties expressly agreed. Notably, the Survivability clause does not state that "the only"

20   clauses which survive termination are those listed in Article 15.10, but that is the position Sohum

21   and CITI have advocated to date. Meanwhile, Sohum's and CITI's interpretation ignores and

22   negates the terms "after this Agreement" in the exclusivity clause. Under Nevada law, the Court

23   cannot adopt Sohum's and CITI's invitation to do so. *Phillips*, 579 P.2d at 176 (Nevada courts

1  construe contracts such that all terms have meaning, and no terms are negated).  Indeed, Sohum's

2  and CITI's interpretation would elevate *the lack of a term*, *i.e.*, a reference to Article 1.3 in the

3  Survivability clause, over an actual term of the parties' agreement.

4        Third, reading the Teaming Agreement as a whole shows that the Survivability clause was

5  intentionally drafted to fill gaps in the Teaming Agreement.  Unlike Article 1.3, the six provisions

6  identified in the Survivability clause do not themselves contain language indicating that those

7  provisions survive termination.  *See, e.g.,* Exhibit A §§ 7 (establishing the intellectual property

8  rights of the parties, without reference to such provision surviving termination), 12 (setting forth

9  the parties' obligations to comply with the Procurement Integrity Act, the Byrd Amendment, and

10  the Lobbying Disclosure Act, without reference to the provision surviving termination).  While

11  Article 6 mentions survivability, it does so only with reference to the parties' non-disclosure

12  agreement; it does not state that Article 6 itself survives termination.  *Id.* § 6 ("During the term of

13  this Agreement, the Parties may exchange proprietary and confidential information.  Such

14  disclosures shall be made in accordance with the NDA, the terms of which may survive the

15  termination of this Agreement.").  Accordingly, a separate survival provision was required in order

16  to have those provisions survive termination, contrary to Article 1.3, which already included its

17  own survival language.  For these reasons, under well-established canons of contract interpretation,

18  it is plain from the face of the Teaming Agreement that the exclusivity clause was intended by the

19  parties to survive termination.

20        **B.**     **VSolvit is Likely to Suffer Irreparable Harm in the Absence of an Injunction**

21        A temporary restraining order and preliminary injunction is necessary here in order to

22  prevent VSolvit from suffering irreparable harm as a result of Defendant's unlawful conduct.  In

23  this Circuit, "[i]rreparable harm is traditionally defined as harm for which there is no adequate

legal remedy, such as an award of damages." *Az. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).  "Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."  *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984).  It is not fatal to the issuance of a preliminary injunction, however, if "damages are susceptible to quantification."  *Onpointe Cmty. Care LV LLC v. Charter Health Holdings, Inc.*, No. 2:22-cv-01235-GMN-DJA, 2023 WL 2430192, at *3 (D. Nev. Jan. 10, 2023) (citations omitted).  Accordingly, "the Ninth Circuit has recognized 'intangible injuries'" as satisfying the irreparable harm requirement.  *Nev. Rest. Serv., Inc. v. City of Las Vegas*, No. 2:15-cv-2240-GMN-GWF, 2016 WL 4721100, at *2 (D. Nev. Sept. 8, 2016) (internal citations omitted).  "Intangible injuries such as loss of goodwill and prospective customers can qualify as irreparable harm."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of . . . irreparable harm.").

Plaintiffs seeking injunctive relief must show that the irreparable harm that will result in the absence of a preliminary injunction is both likely to occur and immediate.  *All. for the Wild Rockies*, 632 F.3d at 1135 (internal citations omitted); *Backman v. Goggin*, No. 2:16-cv-1108 JCM (PAL), 2016 WL 3148388, at *2 (D. Nev. June 2, 2016).  Here, VSolvit will immediately suffer substantial irreparable harm in the absence of its requested injunctive relief.  Compl. ¶¶ 91-101.

### 1.    Harm From Lost or Materially Diminished Bidding Opportunities

In the context of federal government contracting, "the opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."  *Starlite Aviation Operations Ltd. v. Erickson Inc.,* No. 3:15-CV-00497-HZ, 2015 WL 2367998, at *9 (D.

1   Or. May 18, 2015) (internal citations omitted). As the United States Court of Federal Claims has

2   explained: the "lost opportunity to compete on a level playing field for a contract" is irreparable

3   harm. *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 495 (2013) (citing *CRAssociates,*

4   *Inc. v. United States*, 95 Fed. Cl. 357, 390 (2010)); *see also Magnum Opus Techs., Inc. v. United*

5   *States*, 94 Fed. Cl. 512, 544 (2010) ("A lost opportunity to compete in a fair competitive bidding

6   process for a contract is sufficient to demonstrate irreparable harm.") (citing *Red River Holdings,*

7   *LLC v. United States*, 87 Fed. Cl. 768, 791 (2009)); *United Techs. Commc'ns Co. v. Wash. Cnty.*

8   *Bd.*, 624 F. Supp. 185, 188 (D. Minn. 1985) ("The Court is persuaded that the loss of the chance

9   to participate in a fair bidding process raises a significant threat of irreparable injury to the

10  plaintiff."). Irreparable harm has also been found to exist when a government contractor's ability

11  to compete in a pending government contract competition is destroyed. *Beacon Assocs., Inc. v.*

12  *Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (finding as a result of the prime contractor's

13  wrongful termination of their agreement, subcontractor suffered irreparable injury to [its]

14  reputation, and consequential damages resulting from [subcontractor's] inability to effectively

15  compete for the forthcoming contract renewal").

16          Here, the irreparable harm to VSolvit is both immediate and likely if the Court does not

17  enjoin Defendants from breaching the exclusivity provision in the parties' Teaming Agreement,

18  teaming with each other or third parties, and competing against VSolvit for the Beech contract.

19  Compl. ¶¶ 91-101. First, the timing of Defendants' actions have made it such that, absent

20  injunctive relief, VSolvit's ability to compete for the Beech contract (either as prime or

21  subcontractor) will be destroyed or substantially diminished. *Id.* ¶¶ 91-95. The USDA is expected

22  to issue the RFP for the Beech contract competition within the next few weeks ("the release date"),

23  *id.* ¶ 91; and the USDA is expected to require offerors to submit their bids within approximately

two weeks or one month of the release date, in the USDA's discretion, *id*.  Meanwhile, bidding teams have been preparing for the RFP release for months.  *Id.* ¶¶ 92-93.  VSolvit began preparing for the Beech competition in April 2022, conducted many team planning meetings, and exchanged significant confidential and proprietary information to prepare for the Beech procurement.  *Id.* ¶¶ 54-65.

On February 9, 2023, after engaging in activities pursuant to the Agreement for approximately 9 months and pre-proposal activities for approximately 5 months, Defendants notified VSolvit of their intention to terminate the Agreement.  *Id.* ¶¶ 67-68.  If Defendants' improper termination is permitted, VSolvit will have no option but to commence an emergency search for other teammates with which to bid.  *Id.* ¶¶ 91-92.  It is virtually impossible that VSolvit's efforts will be successful at this late juncture on a severely condensed timeline, as it would require VSolvit not only (1) to identify prospective teammates (assuming qualified teammates still remain in the "market" at this late juncture); but also (2) to make an informed business decision as to the viability of a prolonged relationship, which usually requires the exchange of proprietary information.  *Id.* ¶¶ 91-95, 97.  Even if VSolvit was able to identify teammates that match or rival the specific capabilities of Sohum and CITI, who each possess unique capabilities, experience, and past performance with USDA, VSolvit would not have the time to put together a compelling bid.  *Id.* ¶¶ 44, 92-93.  It simply strains credulity to think that VSolvit will have any meaningful opportunity to compete for the Beech contract, without a team, at this late juncture.  *Id.* ¶¶ 91-95, 97.  Rather, it is far more likely, indeed, even expected, that it will not be able to bid for the Beech Program or its submission will not be competitive if this Court does not enjoin Sohum and CITI from their ongoing breach of the Teaming Agreement.  *Id.* ¶¶ 94-95; *see also Beacon Assocs.*, 308 F. Supp. 3d at 288 (loss of teaming partner through wrongful termination of agreement caused

1    irreparable injury in form of inability to effectively compete for the forthcoming contract renewal).

2    This is particularly harmful for a company like VSolvit.  Long-term lucrative contracts are rare,

3    and even more rare for small businesses.  Compl. ¶ 36.  The inability to compete for such a

4    significant contract would be a significant loss for VSolvit.

5        **2.    Harm From Defendants' Access to and Use of VSolvit's Confidential**
6                **Information**
7

8          VSolvit is also facing imminent irreparable harm from Defendants' access to and use of

9    VSolvit's confidential and proprietary information it prepared related to the Beech procurement

10   opportunity.   Courts also issue preliminary injunctions on the grounds that disclosure of

11   confidential information or trade secrets creates irreparable harm to the moving party. *Saini v. Int'l*

12   *Game Tech., Inc.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (deprivation of property interest and

13   competitor's ability to reproduce the confidential information or trade secret without an equivalent

14   investment of time and money constitutes harms that "are not readily addressed through payment

15   of economic damages"). "Disclosure of non-trade secret confidential information is similarly

16   recognized as a serious harm." *Id.* (citing *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n.1

17   (9th Cir. 2000)).  "These harms, which are not readily addressed through payment of economic

18   damages, are sufficient to meet the irreparable injury requirement for a preliminary injunction."

19   *Id.*

20         This Court should find, as it did in *Saini*, that VSolvit's disclosure of its proprietary and

21   confidential information (in reliance on its exclusive agreement with Sohum and CITI) in the run-

22   up to the release date constitutes an intangible irreparable harm that is likely to occur absent the

23   relief requested herein.  434 F. Supp. 2d at 919.  Specifically, VSolvit provided its confidential

24   and proprietary information, including its technical outline, technical approach, and Beech contract

25   win strategy, among other confidential information ("VSolvit's Confidential Information" or the

"CI") to Sohum and CITI to coordinate and enhance the bid on the Beech contract. Compl. ¶¶ 54-65. In the absence of Defendants' promise of exclusivity, it is inherently injurious to VSolvit that Sohum and CITI had access to that confidential information at all; in essence, Sohum and CITI had access to VSolvit's "secret sauce" for the Beech procurement. *Id.* ¶¶ 54-65, 85. But, even more egregiously, *after* Sohum and CITI attempted to terminate the Teaming Agreement for convenience, and announced they would leave the VSolvit team, **Sohum accessed, reviewed, and downloaded VSolvit's CI**. *Id.* ¶¶ 78-86. This occurred while VSolvit was attempting to salvage the relationship and encourage Defendants to meet their contractual obligations. *Id.* ¶ 78.

As Sohum and CITI plan to bid for the Beech program together without VSolvit, *id.* ¶¶ 67-68, the only logical conclusion that can be reached is that Sohum intends to use VSolvit's CI to gain a competitive advantage in the competition, *id.* ¶ 87. In this regard, the harm to VSolvit due to the loss of its CI and its use by a competitor is immeasurable. *Id.* ¶¶ 85, 96. A bidding contractor's technical approach is almost always the distinguishing factor that separates bidders. *Id.* ¶ 85. Due to Defendants' misconduct, Plaintiff is sure to lose its opportunity to compete on a level playing field for the Beech contract. *CW Gov't Travel*, 110 Fed. Cl. at 495; *Magnum Opus Techs.*, 94 Fed. Cl. at 544; *United Tech. Commc'ns Co.*, 624 F. Supp. at 188. Accordingly, this Court should enjoin Defendants from competing and compel them to return to the VSolvit team in good faith.

### C.    The Balance of Equities Starkly Favor VSolvit

In determining whether to grant a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Here, the balance of equities tips decidedly in VSolvit's favor.

As noted above, VSolvit will suffer significant irreparable harm if Defendants are permitted to breach their exclusivity obligations from the Teaming Agreement and compete against VSolvit for the Beech contract. VSolvit has spent almost a year preparing its team bid for an RFP that is to be published imminently. Compl. ¶¶ 54-65. And it shared its confidential and proprietary information with Sohum and CITI in reliance on the parties' promises of exclusivity and good faith. *Id.* ¶¶ 51, 60, 65. Among the documents VSolvit has shared are documents that represent its win strategy for the contract and its technical outline and technical approach—the linchpin documents in obtaining a federal government contract. *Id.* ¶¶ 61-65, 85. Defendants' knowledge and use of that information outside the exclusive teaming arrangement they promised will provide them with an unfair competitive advantage during the procurement process and allow them to take what they want, build upon it, and/or exploit it by developing competing approaches in their own proposal. *Id.* ¶¶ 78-88.

Moreover, as discussed above, there is insufficient time before the Beech RFP is issued for VSolvit to put together a competitive team (if they can put together a team at all). *Id.* ¶¶ 91-95. Bidding teams, including the now-shattered team of VSolvit and Defendants, have been preparing for this procurement for months. *Id.* ¶¶ 92-93. The RFP is expected to be released shortly and there is insufficient time to put together a competitive bid, even if VSolvit could identify new teammates. *Id.* ¶¶ 91-95.

On the other hand, there is no hardship to Sohum or CITI if they are enjoined from competing on another team for the Beech contract. They already agreed, through the Teaming Agreement, to participate in the bid process with VSolvit. *See generally* Exhibit A. Thus, forcing them to do so would be entirely consistent with both expectations and the promises Defendants made as part of the Teaming Agreement. *See generally id.* The only impact on Defendants is that

1    Sohum will not be the prime contractor for the Beech bid.  Compl. ¶ 67.  But that can hardly be

2    characterized as a harm or injury to Defendants, because that is precisely the circumstance to which

3    Sohum and CITI previously agreed.  Exhibit A §§ 1.1, 1.3.  For these reasons, the balance of the

4    equities weighs strongly toward the Court entering a temporary restraining order and preliminary

5    injunction here.

6        **D.    Enjoining Defendants is in the Public Interest**

7        Finally, before entering an injunction, a court must also take into consideration "the public

8    consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

9    When the reach of an injunction is "narrow, limited only to the parties, and has no impact on non-

10   parties, the public interest will be at most a neutral factor in the analysis rather than one that

11   favor[s] in [granting or] denying the preliminary injunction."  *Stormans, Inc. v. Selecky*, 586 F.3d

12   1109, 1138-39 (9th Cir. 2009).  Here, the injunction is narrow and limited only to the parties

13   directly.  Therefore, it is the most neutral factor in the Court's analysis and does not stand in the

14   way of the Court entering injunctive relief.

15       Notably, however, there are other public interest reasons on which the Court should enter

16   an injunction.  Indeed, this Court recognizes that there is a public interest in the enforcement of

17   contracts and judgments and the predictability of commercial transactions.  *First 100, LLC v. Omni*

18   *Fin., LLC*, No. 2:16-cv-00099-RFB-CWH, 2016 WL 3511252, at 3 (D. Nev. June 27, 2016)

19   ("There is a public interest in the enforcement of contracts and judgments and in predictability in

20   commercial transactions."); *Travelers Cas. & Sur. Co. of Am. v. Williams Bro., Inc.*, No 2:12-cv-

21   0058, 2013 WL 5537191, at *12 (D. Nev. Oct. 4, 2013) ("There is a public interest in the

22   enforcement of contracts and judgments.").

1    VSolvit simply is seeking to enjoin Defendants from breaching their contractual promises

2    and prevent the imminent and irreparable harm that will result should that occur.  Defendants

3    agreed to exclusively team with VSolvit to pursue the Beech contract.  Exhibit A § 1.3.  As a

4    material condition to the Teaming Agreement, the Defendants agreed further not to compete

5    directly or indirectly against VSolvit on the Beech program.  *Id.*    There are no negative

6    consequences to the public interest in enjoining Defendants' impermissible actions in

7    contravention of the explicit intentions of the parties set forth in the Teaming Agreement.  *First*

8    *100*, 2016 WL 3511252, at 3.

9    **V.    CONCLUSION**

10    Based on the foregoing, Plaintiff, VSolvit, respectfully requests that the Court grant its

11    Motion for Temporary Restraining Order and Preliminary Injunction and (a) enjoin Defendants

12    from bidding on the Beech RFP as a prime contractor (whether independently or as part of a team)

13    or as a subcontractor on any team other than the VSolvit team expressly contemplated by the

14    Agreement; (b) enjoin Defendants from entering into any teaming arrangements with other

15    offerors under the Beech program now or at any time hereafter; and (c) compel Defendants to team

16    with VSolvit on an exclusive basis for the award of the Beech contract, including the submission

17    of a proposal in good faith.

18    Dated:  March 27, 2023                    Respectfully Submitted,
19
20                                             **VSolvit, LLC**
21                                             By Counsel:
22
23                                             /s/ Maurice B. Verstandig
24                                             Maurice B. VerStandig, NV Bar. No. 15346
25                                             **THE VERSTANDIG LAW FIRM, LLC**
26                                             1452 W. Horizon Ridge Pkway, #665
27                                             Henderson, Nevada 89012
28                                             Telephone: (301) 444-4600
29                                             *mac@mbvesq.com*

1   Matthew E. Feinberg (*pro hac vice* forthcoming)
2   Todd Reinecker (*pro hac vice* forthcoming)
3   Mansitan Sow (*pro hac vice* forthcoming)
4   Matthew T. Healy (*pro hac vice* forthcoming)
5   **PILIEROMAZZA PLLC**
6   1001 G Street, NW, Suite 1100
7   Washington, D.C. 20001
8   Telephone: (202) 857-1000
9   *mfeinberg@pilieromazza.com*
10  *trienecker@pilieromazza.com*
11  *msow@pilieromazza.com*
12  *mhealy@pilieromazza.com*